Wendell Eugene NEWKIRK,
Jr., Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 95–SC–172–MR.

Supreme Court of Kentucky.

Aug. 29, 1996.

Rehearing Denied Feb. 27, 1997.

Ann T. Eblen, Louisville, for appellant.

A.B. Chandler, III, Attorney General, Michael L. Harned, Lana Grandon, Assistant Attorneys General, Criminal Appellate Division, Office of the Attorney General, Frankfort, for appellee.

Michael M. Losavio, Nancy Gall–Clayton, Louisville, for amicus curiae, National Association of Counsel for Children.

LAMBERT, Justice.

In an unbroken line of decisions rendered from time to time throughout the last decade, this Court has repeatedly expressed its distrust of expert testimony which purported to determine criminal conduct based on a per-

ceived psychological syndrome.[1]  In general our reasons have been the lack of diagnostic reliability, the lack of general acceptance within the discipline from which such testimony emanates, and the overwhelmingly persuasive nature of such testimony effectively dominating the decision-making process, uniquely the function of the jury.  In the instant case we must determine whether the trial court properly allowed rebuttal testimony from Dr. John Sullivan, a psychiatrist, by which he explained in general terms victim recantation of accusations of sexual abuse leveled at family members.[2]

Appellant was convicted of the rape and sodomy of his ten-year-old niece and sentenced to concurrent terms of twenty years imprisonment.  From the evidence it appears that while baby-sitting for his niece and her eleven-year-old brother, appellant committed the crimes charged.  On the parents' return to the home, the child victim's distress was discovered and she was taken for a medical examination which revealed recent sexual intercourse.

The child victim named appellant as the perpetrator and criminal charges were brought.  However, in an interview with an Assistant Commonwealth's Attorney two days later, the child recanted her accusation and denied that appellant had committed the crimes against her.  Nevertheless, at trial she testified to appellant's acts of rape and sodomy and on cross-examination, admitted that she had told the Assistant Commonwealth's Attorney that the acts had not occurred.

Over appellant's objection and after an extensive hearing, the trial court determined that a psychiatrist should be permitted to testify concerning the "phenomenon" of re-

cantation in child sex abuse cases.  Prior to the testimony the trial court admonished the jury that the evidence was for "the limited purpose of explaining the psychological dynamics surrounding a recantation following an accusation of sexual abuse.  This evidence is not offered for the purpose of proving whether [the child] was or was not sexually abused."  Thereafter, Dr. Sullivan testified that while he had not seen the child and had no opinion as to whether or not she had been sexually abused, recantation was a common occurrence among sexually abused children.  He stated various reasons therefor which included threats, imposition of blame, fear of loss of home, and fear of the legal system.  The undeniable effect of Dr. Sullivan's testimony was to diminish or eliminate any doubt the recantation might otherwise have raised in the minds of the jurors.

As stated before, this Court has previously confronted various facets of this issue.  We reversed the conviction in *Bussey v. Commonwealth*, Ky., 697 S.W.2d 139 (1985), on grounds that the Child Sexual Abuse Accommodation Syndrome (CSAAS) was not generally accepted in the medical community, and that the expert was unable to connect the victim's symptoms with the appellant rather than some other person.  *Id.* at 141.  The Court indicated that even if one accepted the validity of the syndrome, its existence would not help with the identification of the perpetrator.  *Id.*

We next confronted CSAAS in *Lantrip v. Commonwealth*, Ky., 713 S.W.2d 816 (1986), in which admission of the evidence was held to be prejudicial for the reason, *inter alia*, that "there would remain the question of whether other children who had not been similarly abused might also develop the same

---

**1.** In *Hellstrom v. Commonwealth*, Ky., 825 S.W.2d 612 (1992), we said:

The American Heritage Dictionary defines "syndrome" as "a group of signs or symptoms that collectively indicate or characterize a disease, psychological disorder, or other abnormal condition." [The expert] listed the symptoms but refrained from classifying them directly as the "child sexual abuse syndrome." Avoiding the term "syndrome" does not transform inadmissible hearsay into reliable scientific evidence.  Neither the syndrome nor the symptoms that comprise the syndrome have

recognized reliability in diagnosing child sexual abuse as a scientific entity.
*Id.* at 614.

**2.** Retraction or recantation is universally regarded as one of the behaviors associated with child sexual abuse accommodation syndrome. *Lantrip v. Commonwealth*, Ky., 713 S.W.2d 816, 817 (1986); Michele M. McCarthy, Note, *Admissibility of Expert Testimony on Child Sexual Abuse Accommodation Syndrome in Kentucky*, 81 Ky. L.J. 727, 729 (1993).

symptoms or traits." *Id.* at 817. The principal point in *Lantrip* was the lack of diagnostic reliability of a positive CSAAS finding because children who had not been sexually abused might well exhibit similar traits. *Id.* Our decisions in *Bussey* and *Lantrip* broadly rejected admission of CSAAS testimony.

In *Hester v. Commonwealth,* Ky., 734 S.W.2d 457 (1987), we encountered facts and circumstances which are quite similar to those which prevail here. The appellant was accused of sexually abusing his step-daughters. *Id.* The children informed their teacher and an investigation was undertaken. *Id.* During the investigation, a videotaped statement was taken in which the children detailed incidents of sodomy and sexual abuse. *Id.* At trial, however, the children flatly denied the occurrence of the acts and stated that they had made up the story in hopes of having appellant removed from the home so that they could see their natural father. *Id.* Over appellant's objection, a social worker was permitted to testify that when children have given specific details of sexual matters, generally, the acts have occurred. *Id.* at 457–58. She continued: "One of the reasons children often will say later it didn't happen is because the family has put pressure on them either verbally, or by their actions to be loyal to the family." *Id.* at 458. Holding the admission of the expert testimony to be reversible error, we stated: "The admission of expert opinion was improper as it, in effect, told the jury to believe the story the children had initially told and disbelieve the testimony given in open court." *Id.* We relied in part on *Pendleton v. Commonwealth,* Ky., 685 S.W.2d 549 (1985), which held that a clinical psychologist should not be permitted to testify that the defendant lacked the state of mind to commit the crimes. *Id.* at 553. "An opinion as to whether the accused had the ability or propensity to commit such an act is improper because it is an opinion on the ultimate fact, that is, innocence or guilt. Consequently it invades the proper province of the jury." *Id.*

Aside from the qualifications of the expert witnesses, there is no substantial distinction between the testimony in *Hester* and that which was given here. In each case, the accusation was made and recanted and in each case the expert was permitted to give the jury a psychological basis for disregarding the recantation.

Our decision in *Mitchell v. Commonwealth,* Ky., 777 S.W.2d 930 (1989), relied on the authority cited hereinabove, but also emphasized that children who have not been sexually abused often exhibit one or more symptoms of the CSAAS. *Id.* at 932. As such, the symptoms were deemed to lack probative value of the existence of sexual abuse and to be irrelevant as to the guilt or innocence of a particular person. *Id.* at 932–33. In *Hellstrom v. Commonwealth,* Ky., 825 S.W.2d 612 (1992), we focused on "delayed disclosure," which, like recantation, is regarded as one of the elements of CSAAS, and held admission of such evidence to be error. *Id.* at 613–14. The Court noted that "[n]either the syndrome nor the symptoms that comprise the syndrome have recognized reliability in diagnosing child sexual abuse as a scientific entity." *Id.* at 614. We quoted with approval from *State v. Rimmasch,* 775 P.2d 388 (Utah 1989), as follows: "Psychologists and psychiatrists are not ... experts at discerning the truth. Psychiatrists are trained to accept facts provided by their patients, not to act as judges of patients' credibility." *Hellstrom,* 825 S.W.2d at 614 (quoting *Rimmasch,* 775 P.2d at 406). We concluded by holding that the expert "testimony was not probative of whether sexual abuse occurred and [the expert] invaded the province of the jury by determining witness credibility and expressing his unqualified opinion on the ultimate issue." *Hellstrom,* 825 S.W.2d at 614.

Our most recent decision on point, *Hall v. Commonwealth,* Ky., 862 S.W.2d 321 (1993), repeats many of the familiar principles from the cases cited and discussed hereinabove. *Hall* made the further point that it was improper for the expert witness to express her opinion as to the accuracy of the child victim's testimony.

It was also clearly improper for Ms. Ballou to testify that in her opinion T.H.'s testimony was most likely accurate. Even had Ms. Ballou been a licensed psychologist at the time she examined the children, she would "not have qualif[ied] as an ex-

pert on the credibility of the child and the reliability of statements she made while she was evaluating her." *Hellstrom, Id.* at 614. In *Hellstrom,* we embraced the view of the Utah Supreme Court on this specific question: "[These witnesses] are not.... experts at discerning the truth. [They] are trained to accept facts provided by their patients, not to act as judges of patient's credibility." *State v. Rimmasch,* 775 P.2d 388 (Utah 1989). Furthermore, the prosecutor emphasized this testimony in his closing argument by stating that, "Miss Ballou, the psychologist who interviewed T.H. on a couple of occasions, told you that what T.H. told you was the truth." The majority of this court has held that the admission of this type of testimony is reversible error. *Hellstrom, Id.* Therefore, we reverse on this issue.

*Id.* at 323.

The foregoing authorities demonstrate unmistakably that this Court has not accepted the view that the CSAAS or any of its components has attained general acceptance in the scientific community justifying its admission into evidence to prove sexual abuse or the identity of the perpetrator. Moreover, such evidence has been rejected on grounds that it lacks relevancy for failure to make the existence of any fact of consequence more probable or less probable than it would have been without the evidence. KRE 401. In the language of *Lantrip v. Commonwealth,* 713 S.W.2d 816 (1986), "[e]ven should it become accepted by the scientific community that a child who had been sexually abused is likely to develop certain symptoms or personality traits, there would remain the question of whether other children who had not been similarly abused might also develop the same symptoms or traits." *Id.* at 817. Finally, our decisions have expressed grave concern that the expert may invade the province of the jury by unduly influencing its assessment of credibility.

■ Against this backdrop of distrust for syndrome evidence of the type at issue here, we must consider whether anything about this case is sufficient to cause a departure from the general rule. The trial court was persuaded that the rebuttal nature of the

evidence and its presentation in general terms rather than being specific to this case sufficiently distinguished the evidence here from that in *Hester v. Commonwealth,* Ky., 734 S.W.2d 457 (1987), and the other cases. The trial court said:

*Hester* is distinguishable from the instant case in that the expert therein commented on the credibility of a particular class, i.e., abused children. The Commonwealth does not wish to introduce an expert's opinion on the credibility of abused children as a group or on the credibility of the [abused child's] testimony at trial. The Commonwealth seeks to introduce general testimony to show that it is common for children to report sexual abuse, and then retract their allegations.

*Commonwealth v. Newkirk,* No. 93–CR–0401, slip op. at 4 (Nov. 30, 1994).

We are simply unable to accept the trial court's view. The unmistakable message from Dr. Sullivan's testimony was that, in general, a jury should believe the initial accusations made by a child and disbelieve the recantation. The only reason generally advanced for admitting CSAAS testimony is its relevance to credibility of the victim, particularly when the defense has presented evidence of recantation in order to attack credibility. *People v. Beckley,* 434 Mich. 691, 456 N.W.2d 391, 399 (1990). Unless the evidence is probative of credibility, it is utterly immaterial to any aspect of the case. It would simply be nothing more than a theoretical discussion.

This Court has previously stated that there is no such thing as expertise in the credibility of children. *See Hall v. Commonwealth,* Ky., 862 S.W.2d 321, 323 (1993). In fact, we have embraced the view that mental health professionals are not experts at discerning the truth; they are trained to accept facts provided by their patients without critical examination of those facts. *Hellstrom v. Commonwealth,* Ky., 825 S.W.2d 612, 614 (1992). The testimony of Dr. Sullivan at both the admissibility hearing and the trial appears to bear this out. There is no indication that he gave consideration to the possibility that the initial accusation by a child who later recants is a false accusation and that the recantation is

true. A scholarly proponent of the admissibility of such syndrome evidence, while arguing that the manner of reporting indicates a great likelihood of actual sexual abuse, has admitted, nevertheless, that children do lie about sexual abuse. This source has fixed the false allegation rate at between 2% and 8%. Mark D. Everson & Barbara W. Boat, *False Allegations of Sexual Abuse by Children and Adolescents*, 28 J.Am.Acad.Child & Adol.Psy. 230, 234 (1989).

From his testimony, Dr. Sullivan appears to have broadly assumed that all accusations of child sex abuse are true, and perhaps this is not inappropriate as his practice is largely devoted to the treatment of children who are believed to have been sexually abused. For our purposes, however, such an assumption is inherently unsound. While it may be entirely proper for a clinician to accept a patient report of sex abuse at face value and proceed to render treatment on that basis, for forensic purposes, such an assumption is utterly inappropriate. One may not assume the truth of a disputed fact and thereafter use the assumption to defeat a contradictory assertion, nor should the contradiction itself be interpreted as enhancing the credibility of the original assertion. Dr. Sullivan's testimony is remarkably similar to that of the expert witness in *Hester v. Commonwealth*, Ky., 734 S.W.2d 457 (1987), who said, "Children do not usually have a lot of details in—when they are—tell something like this unless it has actually happened,.... When they have given specific details to adults, generally—well almost universally this has happened to them." *Id.* at 458.

A number of our decisions in this arena have also questioned whether expert testimony of this type invades the province of the jury as to the ultimate fact. In *Hellstrom v. Commonwealth*, Ky., 825 S.W.2d 612 (1992), we said that the expert testimony improperly "invaded the province of the jury by determining witness credibility and expressing [an] unqualified opinion on the ultimate issue." *Id.* at 614. In *Hester v. Commonwealth*, Ky., 734 S.W.2d 457 (1987), we said "[e]xpert opinion which purports to resolve the ultimate issue before the jury[, which version is true,] is inadmissible." *Id.* at 459.

In *Hall v. Commonwealth*, Ky., 862 S.W.2d 321 (1993), we stated "the general rule is that opinion evidence, in order to be admissible, must not decide an ultimate issue of fact." *Id.* at 322.

It has been suggested that our "ultimate fact" decisions are inconsistent. *See* Michele M. McCarthy, Note, *Admissibility of Expert Testimony on Child Sexual Abuse Accommodation Syndrome in Kentucky*, 81 Ky.L.J. 727, 743 (1993); *see also Pendleton v. Commonwealth*, Ky., 685 S.W.2d 549, 553 (1985) (holding such opinion testimony improper); *Carpenter v. Commonwealth*, Ky., 771 S.W.2d 822, 825 (1989) (allowing testimony which could be regarded as suggesting a "solution of the ultimate problem."). However, there is no ambiguity in our decision to eliminate the proposed Rule 704 from the Kentucky Rules of Evidence. As Professor Lawson observed:

> The proposal was initially enacted into law by the General Assembly but was rejected by the Kentucky Supreme Court in its consideration of the Rules. Thus, the Kentucky Rules exist without a provision dealing with expert testimony on ultimate issues. Given the role the Supreme Court played in these developments, one can only believe that the ultimate fact prohibition will continue to play a major role in decisions on admissibility of expert testimony.

Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 6.25, at 311 (3d ed. 1993).

While there may be inconsistencies in our decisions on ultimate fact opinion testimony, where the determination of credibility is synonymous with the ultimate fact of guilt or innocence, expert opinion is inadmissible. An expert witness may not testify that a defendant is guilty. When, as in this case, an expression of opinion as to credibility is the equivalent of an opinion as to guilt or innocence, it is of no consequence that the testimony was presented in a general manner rather than as specific to the case or on rebuttal rather than as evidence in chief.

Appellee has observed that a number of our prior decisions reject CSAAS testimony for its failure to satisfy the *Frye* standard of admissibility. *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013 (1923); *see Hellstrom v.*

*Commonwealth,* Ky., 825 S.W.2d 612 (1992); *Mitchell v. Commonwealth,* 777 S.W.2d 930 (1989); *Lantrip v. Commonwealth,* Ky., 713 S.W.2d 816 (1986); *Bussey v. Commonwealth,* Ky., 697 S.W.2d 139 (1985). It contends that with our decision in *Cecil v. Commonwealth,* Ky., 888 S.W.2d 669 (1995), wherein we acknowledged the standard set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the testimony is adequate to satisfy the revised standard of admissibility. *See also Mitchell v. Commonwealth,* Ky., 908 S.W.2d 100, 101 (1995).

In *Daubert* abandonment of the *Frye* test was predicated upon the text of Rule 702 of the Federal Rules of Evidence and the absence of legislative history to suggest the continued viability of general scientific acceptance as the standard for admissibility. Professor Lawson has observed that the *Frye* test was replaced by what may be described as a general reliability test and that "[b]eyond this conclusion about *Daubert,* one can find more ambiguity than clarity and in early commentary upon the case one can find more criticism than praise for what the Court has done in this most critical area of evidence doctrine." Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 11.35, 62 (3d ed. Supp.1995). The precise contours of *Daubert* and Rule 702 are still in formation and we are unwilling to declare now that testimony of the type offered by Dr. Sullivan satisfies the revised standard set forth in *Daubert.* We observe, however, that two of the primary criteria suggested in *Daubert* to determine scientific reliability are whether the principle is subject to falsifiability and whether the known or potential error rate has been evaluated. 509 U.S. at 593–594, 113 S.Ct. at 2797, 125 L.Ed.2d at 483. The experts who testified in favor of admitting the rebuttal testimony made no pretense of saying whether the scientific principle at issue is subject to testing for falsifiability or refutability, and certainly did not pretend to know the potential error rate. At least on these bases, the evidence in question appears to fall short of the *Daubert* standard for admissibility.

Regardless of whether the expert testimony of Dr. Sullivan was admissible under *Daubert* or whether it should have been excluded upon various other grounds which include KRE 403, we remain convinced that the testimony lacked relevancy and invaded the province of the jury by expressing an opinion on the ultimate issue of guilt or innocence.

We recognize that some will regard this opinion as regressive and unenlightened. Some will wrongly conclude that we fail to recognize the extent of child sexual abuse or even that we elevate the rights of criminals over defenseless children. We remind those who hold such views that every person accused of committing a crime is entitled to the presumption of innocence and to have such presumption continue until guilt is proven beyond a reasonable doubt. The admission of theoretical expert evidence which presumes guilt from the very fact of the accusation is contrary to our most fundamental rights. Moreover, if we should embark upon the path toward freely admitting expert testimony of this nature, it would be difficult to turn back. For instance, if an expert can testify that children who accuse adult family members of sexual abuse are probably telling the truth despite a subsequent recantation, it would follow that a step-parent so accused could introduce expert opinion that children often fabricate accusations against step-parents. Likewise, if symptomatic evidence of CSAAS is admissible to prove abuse, the absence of such symptoms would necessarily be admissible to prove that abuse had not occurred. Such a result would be most undesirable as even Dr. Sullivan testified that not all children who have been sexually abused exhibit symptoms commonly associated with CSAAS. We join with the Pennsylvania Supreme Court in *Commonwealth v. Dunkle,* 529 Pa. 168, 602 A.2d 830 (1992), as follows:

We are all aware that child abuse is a plague in our society and one of the saddest aspects of growing up in today's America. Nevertheless, we do not think it befits this Court to simply disregard long-standing principles concerning the presumption of innocence and the proper admission of evidence in order to gain a greater number of convictions. A conviction must be obtained through the proper and lawful admission of evidence in order

to maintain the integrity and fairness that is the bedrock of our jurisprudence.

*Id.* 602 A.2d at 838.

In final analysis, the more that courts permit experts to advise the jury based on probability, classifications, syndromes and traits, the more we remove the jury from its historic function of assessing credibility. While a criminal may be facile with his denials and explanations and a child may be timid and halting, we entrust to the wisdom of the twelve men and women who comprise the jury the responsibility to sort between the conflicting versions of events and arrive at a proper verdict.

■ We have also considered appellant's claim of trial court error with respect to the admission of out-of-court statements by the victim to the investigating police officers and the doctor who examined her at the hospital. In view of the victim's inability to recall specific details during her testimony at trial, there was no error in the trial court's admission of her statements to the police officers and physician. *Wise v. Commonwealth,* Ky. App., 600 S.W.2d 470, 472 (1978). The trial court has considerable discretion with respect to the admission and exclusion of evidence in circumstances such as these and nothing here amounts to an abuse of that discretion.

For the foregoing reasons, the judgment of the Jefferson Circuit Court herein is reversed and this cause remanded for a new trial not inconsistent herewith.

STEPHENS, C.J., and BAKER, LAMBERT, and STUMBO, JJ., concur.

GRAVES, J., files a separate dissenting opinion in which Special Justice BARRY WILLETT and WINTERSHEIMER, J., join.

Special Justice BARRY WILLETT files a separate dissenting opinion in which GRAVES and WINTERSHEIMER, JJ., join.

GRAVES, Justice, dissenting.

Respectfully, I dissent.

Our adversarial trial system has evolved into a very sophisticated and expensive search for the truth. Kentucky remains as one of the few jurisdictions that still rejects all testimony regarding the phenomenon clinically identified and demonstrated as the Child Sexual Abuse Accommodation Syndrome which provides jurors a psychological explanation for certain behavior in small children following sexual abuse. Such testimony is necessary because these children often exhibit conduct that is inconsistent with the jurors' life experiences or understanding of human nature in children.

After an attack on the victim's credibility, the prosecution offered as rebuttal testimony a reason for the victim's retraction. The retraction symptom of the CSAAS fully satisfies the *Frye* test. This limited testimony should be allowed in Kentucky at this time as the need for a rationale of recantation is crucial for the jury's understanding. As is the case with all testimony, the jury may accept or reject the explanation in whole or in part.

While all five symptoms of the CSAAS syndrome have not been wholly embraced in the field of psychology, however, the recantation symptom is widely accepted and confirmed by credible studies at renowned research institutions by well credentialed experts.

WILLET, Special Justice, and WINTERSHEIMER, J., join in this dissenting opinion.

BARRY WILLETT, Special Justice, dissenting.

I respectfully dissent. I would affirm the conviction and hold that the trial court committed no error in admitting the rebuttal testimony of John Sullivan, M.D.

The majority opinion has mischaracterized the testimony of Dr. Sullivan as impermissible expert testimony relating to Child Sexual Abuse Accommodation Syndrome (CSAAS). Based on six opinions in which this court has reversed criminal convictions because CSAAS testimony was erroneously admitted

into evidence,[1] the court reverses appellant's conviction. Unfortunately, the majority opinion fails to distinguish between the general prohibition of the admissibility of expert testimony relating to CSAAS and rebuttal testimony regarding the phenomenon of recantation.

The expert testimony at issue was from child psychiatrist John Sullivan, M.D. Prior to trial, the trial court conducted a lengthy hearing on the Commonwealth's motion to introduce expert testimony at trial regarding recantation. Three competent experts, a child psychiatrist, a clinical social worker, and a licensed clinical psychologist, testified in the hearing that recantation is a common phenomenon among child sexual abuse victims and that it is widely accepted within their respective scientific fields. Appellant failed to present any expert testimony at the hearing to rebut the opinions of the Commonwealth's experts.

The trial court granted the Commonwealth's motion to introduce expert testimony at trial regarding recantation ruling it would:

allow the Commonwealth to introduce expert testimony for the limited purpose of rebutting any attack on [the victim's] credibility based upon the recantation of her allegations of her abuse, by explaining in general terms why an alleged victim might recant.

At trial, the appellant brought the credibility of the victim into question by impeaching[2] her on the basis of her recanting the allegations of her sexual abuse prior to trial. The trial court allowed Dr. Sullivan's testimony with the following limiting admonition:

This witness is being called to testify for the limited purpose of explaining the psychological dynamics surrounding a recantation following an accusation of the sexual abuse. This evidence is not offered for the

purpose of proving whether [victim] was or was not sexually abused.

Before beginning the substance of his testimony Dr. Sullivan made clear to the jury that he had not treated the victim and that he was not there to give an opinion on whether or not she had been abused. He then explained what recantation is and testified that recantation is "very widely accepted" among "any mental health professionals who work with children." Dr. Sullivan stated that recantation is a common occurrence with sexually abused children and told the jury of the most common reasons for a child to recant. He went on to testify that children cannot always articulate their reasons for recanting and will sometimes not provide reasons. He reiterated that he had not discussed anything with the victim or her parents, did not know the facts of the case, and had no idea if recantation applied in this case.

The majority opinion finds that Dr. Sullivan's testimony should have been excluded on the basis that it both lacked relevance and invaded the province of the jury by expressing an opinion on the ultimate issue of guilt or innocence. Thus, I will first analyze whether Dr. Sullivan's testimony was relevant.

KRE 401 reads as follows:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Professor Lawson reminds us that the law of evidence tilts heavily toward admission of evidence rather than exclusion. Lawson states "an item of evidence is relevant (thus admissible absent intervention by some exclusionary policy) if it has *any tendency* to increase or decrease the probability of a pertinent factual proposition." Robert G.

---

1. *Bussey v. Commonwealth,* Ky., 697 S.W.2d 139 (1985); *Lantrip v. Commonwealth,* Ky., 713 S.W.2d 816 (1986); *Hester v. Commonwealth,* Ky., 734 S.W.2d 457 (1987); *Mitchell v. Commonwealth,* Ky., 777 S.W.2d 930 (1989); *Hellstrom v. Commonwealth,* Ky., 825 S.W.2d 612 (1992); and *Hall v. Commonwealth,* Ky., 862 S.W.2d 321 (1993).

2. Appellant elicited from the victim facts relevant to her recantation both on cross examination in the Commonwealth's case and on direct examination in his case-in-chief.

Lawson, *The Kentucky Evidence Law Handbook*, § 2.05, p. 53 (3rd Ed.1993).

The majority opinion fails to consider that the appellant's guilt or innocence is not the only fact that is of consequence in this action. "Credibility of witnesses is a 'fact of consequence' for purposes of relevancy. A wide array of evidence is admissible only because it renders testimonial credibility more probable or less probable than it would be without the evidence." *Id.* at 55. This Court recognized in *Sanborn v. Commonwealth*, Ky., 754 S.W.2d 534, 545 (1988), that the "credibility of a witness' relevant testimony is always at issue." Thus, Dr. Sullivan's rebuttal testimony which concerned the credibility of the witness/victim clearly falls within the KRE 401 definition of relevancy.

Next, we turn to whether Dr. Sullivan's testimony invaded the province of the jury by expressing an opinion on the ultimate issue. Despite the conclusion of the majority opinion to the contrary, Dr. Sullivan's testimony served to explain the phenomenon of recantation rather than to opine about the appellant's guilt or innocence. Dr. Sullivan did not testify that Newkirk abused the child, thus he did not testify regarding the "ultimate issue" of Newkirk's guilt or innocence. Dr. Sullivan likewise did not testify that the child had been abused, nor that her recantation was evidence that she was abused, nor that the child's original statement before her recantation was the truth.

Rather, the doctor merely explained why *some* child sexual abuse victims *may* recant their allegations of sexual abuse at some point in the process of the criminal prosecution of the alleged perpetrator. The trial judge admonished the jury that Dr. Sullivan was being called to testify for the limited purpose of explaining the psychological dynamics surrounding a recantation following an accusation of sexual abuse. The trial judge further admonished the jury that the evidence was not being offered for the purpose of proving whether the child victim was or was not sexually abused. It was then up to the jury to determine whether *this child* had recanted because her first statement was untrue or because of some other reason. Dr. Sullivan's testimony allowed the jury to per-

form its proper function in determining the child's credibility after being provided pertinent information.

Permitting the appellant to impeach the child victim's credibility on the basis of a previous recantation without also allowing the Commonwealth to present testimony explaining the phenomenon of recantation gives the alleged perpetrator an unfair advantage to exploit the process of how some child sexual abuse victims respond to abuse. Dr. Sullivan's rebuttal testimony is akin to that in *Reed v. Commonwealth*, Ky., 738 S.W.2d 818, 821 (1987) in which this court held that when a witness's credibility has been attacked by charges of recent fabrication, rebuttal evidence may be introduced to rehabilitate the credibility of the witness. This court also held that the opinion of an expert on the ultimate issue is admissible where such evidence assists the trier of fact. *Carpenter v. Commonwealth*, Ky., 771 S.W.2d 822, 825 (1989).

After determining that Dr. Sullivan's evidence is relevant the next inquiry is whether it complies with KRE 702 which provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise.

The first question regarding the admissibility of Dr. Sullivan's testimony under KRE 702 is whether the substance of his testimony will assist the jury to understand the evidence or determine a fact in issue. It has long been the rule in Kentucky that the substance of the expert testimony must be of such a character as not to fall within the range of common experience and observation and therefore not be intelligible to jurors without the aid of opinion testimony. *Greer's Adm'r v. Harrell's Adm'r*, 306 Ky. 209, 213, 206 S.W.2d 943, 946 (1947).

When a jury of lay adults, hearing the horrible details in a typical child sexual abuse case, is confronted with a child victim recanting his or her previous allegations of sexual abuse, it is understandable that they would

tend to apply an adult standard to the child victim's behavior in an effort to understand what motivates the victim to recant his or her allegations. The reality of child sexual abuse is that children respond differently than do adults to both the abuse and the process of disclosing the abuse to the proper authorities.

The Louisiana Supreme Court, in *Wimberly v. Gatch*, 635 So.2d 206, 213 (La.1994), explained why expert testimony can help the trier of fact understand a child's behavior:

Adults frequently have preconceived ideas about how a traumatized person will react after infliction of the trauma. The child victim of sexual abuse does not react to the situation according to adult concepts of self-determination with autonomous, rational choices. In fact, their behavioral patterns vastly differ from adult expectations. (Citations omitted.)

Expert testimony under these circumstances is neither diagnostic nor probative of the ultimate issue in the case. Dr. Sullivan's testimony had neither the intent nor effect of diagnosing sexual abuse and therefore did not improperly invade the province of the jury. To the contrary, Dr. Sullivan's testimony served to assist the jury to understand why some child victims of sexual abuse may recant their allegations of abuse. In the instant case, it is clear that the jury was having difficulty understanding why the child victim had recanted her allegations of sexual abuse. At the conclusion of the victim's direct examination in the Commonwealth's case, a juror was allowed to ask the victim why she testified she had been raped but had told other people it did not happen. The victim responded, "I don't know."

When expert scientific testimony is proffered, the trial court must next "make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology can be applied to the facts in issue." *Mitchell v. Commonwealth*, Ky., 908 S.W.2d 100, 101 (1995) (in which this court adopted the standard of review for scientific evidence set forth in *Daubert v. Merrell Dow Pharmaceuticals*

*Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).

Dr. Sullivan is a child psychiatrist, board certified in both psychiatry and neurology. He received two years of post-medical school fellowship training in child psychiatry. Dr. Sullivan, in addition to being in private medical practice in child psychiatry, was Medical Director of Brooklawn Treatment Center and Medical Director of the Children's Unit at Our Lady of Peace Hospital. The majority of his medical practice and experience dealt with treating child victims of sexual abuse. The appellant's trial counsel offered to stipulate to Dr. Sullivan's expertise. In addition to Dr. Sullivan, two other competent experts testified at the hearing. One was a clinical social worker and child psychology professor at the University of Kentucky, and the other was a licensed clinical psychologist.

The trial court conducted a lengthy "preliminary hearing on the matter utilizing the standards set forth in *Daubert*." *Mitchell* at 102. All the experts kept current with the literature in the area of child sexual abuse and had published or were in the process of publishing in their fields. The experts testified that recantation is not used to determine whether sexual abuse had occurred or not, but is considered at the treatment stage. The experts further testified that most lay persons would not understand the phenomenon of recantation. Dr. Sullivan testified that recantation is "widely accepted" in the field of psychiatry. He described recantation as being recognized for "decades," but that the research in the area had taken off in the last 15 to 20 years. Lane Veltcamp, a licensed clinical social worker and child psychology professor at University of Kentucky who has published a book on child abuse and neglect testified that recantation is "something we see on a regular basis" and is "accepted across the country as something frequently seen in children who have been abused." He stated that recantation has been recognized since the mid–1970's and is a regular topic at conferences across the country. Sally Lawson Brensale, Ph.D., a licensed clinical psychologist who has attended and presented at numerous child abuse conferences, testified that recantation is "com-

mon," that it is "certainly accepted" in her field, and that it has been recognized in the field of psychology since the mid- or late–1970's.

Following this lengthy hearing, of exactly the type required in *Mitchell,* the trial court granted the Commonwealth's motion to allow testimony regarding recantation for the limited purpose of rebutting the victim's testimony based on her recantation of the abuse allegations. The trial court determined that the phenomenon of recantation enjoyed general acceptance within the psychiatric and psychological communities and noted that numerous courts have allowed an expert to testify in rebuttal to explain why a child recants. He further found that testimony regarding recantation would assist the jury in understanding the possible behavior of a child victim of sexual abuse. Thus, he correctly determined that the testimony met the requirements of KRE 702. The appellant failed to present **any** evidence to the contrary.

The standard of review on appeal is whether the trial court abused his or her discretion in deciding the admissibility of the evidence. *Mitchell* at 102. The trial court did not abuse his discretion in admitting the rebuttal testimony of Dr. Sullivan.

Other jurisdictions have allowed the admission of expert testimony to explain in general terms, for the limited purpose of rebutting an attack on the victim's credibility, why an alleged victim of sexual abuse might recant. See *Davenport v. State,* 806 P.2d 655, 659 (Okl.Cr.1991) ("Numerous courts have allowed an expert to testify in rebuttal to explain ... why a child recants.") and cases cited therein.

As stated in *State v. Foret,* 628 So.2d 1116, 1130 (La.1993), which quotes from Goldstein, "Credibility and Incredibility: the Psychiatric Examination of the Complaining witness," 137 Am.J.Psychia. 1238, 1240 (1980):

> The expert testimony on why victims might recant or delay reporting is being offered to rebut attacks on the victim's credibility. So long as the expert limits the testimony to general characteristics that would explain delays in reporting, recantations, and omissions of details, the

testimony will not "substitute [the expert's] estimation of credibility for that of the jury. Rather, it is to provide a scientific perspective for the jury according to which it can evaluate the complainant's testimony for itself."

Expert testimony explaining the phenomenon of recantation by some victims of child sexual abuse should be admissible for the limited purpose of rebutting an attack on the child victim's credibility, if the expert testimony can meet the requirements for admissibility set forth in KRE 702 and *Mitchell, supra.* Any such testimony should be preceded by a limiting instruction to the effect that the expert's testimony is not intended and should not be used to determine whether the victim's sexual abuse allegation is true.

GRAVES and WINTERSHEIMER, JJ., join this dissent.